## WALLACE v. MISSOURI PAC. R. CO.

### No. 4575.

Court of Appeal of Louisiana. Second Circuit.

Dec. 1, 1933.

Hudson, Potts & Bernstein, of Monroe, for appellant.

Vinson M. Mouser, of Columbia, for appellee.

TALIAFERRO, Judge.

Plaintiff sues to recover the value of three head of Jersey cattle of his own, and the value of one head of another person, which were killed by defendant's north-bound freight train in May, 1932, at a crossing approximately one and one-half miles north of Riverton Station in Caldwell parish. The acts of negligence imputed to the train crew are:

(1) That the train was driven towards the

*Rehearing denied January 3, 1934.

crossing at an excessive rate of speed, and no effort was made to slow it down so as to avoid striking the cattle, which were running with other cattle, towards the crossing ahead of the train on the gravel highway adjoining and parallel to its right of way.

(2) That by the exercise of due care the engineer and fireman, operating the train, could have seen said stock in time to have avoided striking them, by either slowing the train down or stopping it.

(3) That no whistle was blown or bell rung, nor other warning given by the crew, as the train approached the crossing.

Defendant denies negligence on the part of its train crew in connection with the killing of the stock, and denies any liability to plaintiff on that account.

The lower court held that the cattle were killed through and because of the negligence of those operating defendant's train in approaching the crossing, and gave judgment for the sued-for value of the stock. This appeal is prosecuted by defendant.

There is very little serious dispute as to the material facts. To better understand the situation at time of and immediately prior to the killing of these cattle, these pertinent facts must be considered: Defendant's train was going north at the schedule rate of forty miles per hour. It consisted of some seventy-five loaded cars, besides engine, baggage car, and caboose. Going at this rate it would require around one-half mile in which to bring it to a stop. For a distance of about one mile north of the crossing in question the track is straight with nothing to obstruct the view as the crossing is approached from the south. At the southern end of this tangent the track describes a curve to the east and the track again is straight. So, as this train proceeded north it entered and left this curve before entering the tangent directly south of the crossing. The right of way of defendant here is one hundred feet or more wide. It is fenced. This fence goes to a cattle guard at the crossing. Adjacent to the right of way, on east side, there is a gravel highway about forty feet wide. On the east side of this highway the land is open and in cultivation and is inclosed by a fence that runs up the east side of the highway to the crossing and ties to a cattle guard in the track. This road, inclosed on both sides by fences, it will be seen, runs along the railroad right of way up to the crossing where the cattle were killed. These cattle, with several others, had escaped from a pasture in which they were regularly kept, and wandered up the gravel highway towards the crossing.

It appears that the lights of a train are so adjusted that they focus between the rails of the track and illuminate the space covered by the right of way on both sides, but no further; at least beyond this distance the flare is weak; ineffective. The lights of this train were supposed to be of sufficient power to enable the engineer to discern an object the size of a man nine hundred feet away, if on the track or right of way.

The engineer testified he did not observe the herd of cattle on the highway until the train was about one hundred fifty yards from the crossing, at which time the cattle were much nearer to it; in fact, the north end of the herd was turning the curve in the road at the crossing, near the lower guard wire. He does not say whether the cattle were walking or running. He does state that the leader of the herd stopped on the track and began to "mill," and the others then stopped, and but for this action they all would have reached a point of safety. He says that as the train approached the crossing the whistle was sounded, as is customary at such places, and when he realized the cattle were attempting to cross the track in front of the train the bell was rung and the brakes applied, but the speed of the train was not appreciably affected thereby before the crossing was reached because the intervening distance was too short.

The fireman corroborated the engineer as to the distance the train was from the crossing when the cattle were observed. He says, however, they were then on the track, and one became excited and turned back, and that stopped the others. The four were then run over. He also corroborates the engineer as to blowing the whistle, ringing the bell, and applying the brakes.

There was one other person who claims to have seen the accident. He is a negro tenant who says he was two hundred feet north of the crossing and one hundred feet west of the railway track. He states that he saw this herd of cattle clearly when the train made the curve a mile south of him, and continued to see them from the reflection of the train's light until they were killed; that when he first saw them they were three hundred feet or four hundred feet south of the crossing and were running towards it. He says the crossing whistle was blown, but the bell was not ringing, nor were the brakes of the train applied. He also says all the other cattle passed over the crossing to safety ahead of the four killed. This testimony may be true and it may not. On the face of it, it has weak points. It is improbable that the train's light a mile away would have enabled him to recognize the cattle, even though they had been in the direct line of the light, which they were not. He was on the west side of the track and one hundred feet out of line of the light, and over one hundred fifty feet west of the cattle, which were east of direct line of the light. He is positive the brakes were not applied because he did not hear the

noise the application should produce. At the distance he was standing—three hundred feet or more from the train—it would hardly be expected that one could hear the noise produced by application of brakes of a long freight train moving at the rate of forty miles per hour. He also states positively Mr. Hudson, owner of one of the animals killed, came to the scene the morning after the accident and identified his own cow, and Mr. Wallace's also. Mr. Hudson says he did not see the dead cattle at all as they had been buried by the defendant's section foreman before he arrived.

Our brother of the lower court, in written reasons for judgment, states that the crossing was a hazardous one, and that it was the duty of the defendant to observe great caution in operating trains over it, and to observe the movement of traffic and live stock going north on the highway, which of necessity had to cross the defendant's track here. He also found, as a matter of fact, that the train crew should have seen the cattle in time to have stopped the train, or to have reduced its speed, thus allowing time for the stock to pass safely over the crossing.

It is not the duty of the operator of a train to stop, or even slow down, when approaching a crossing in the open country, simply because traffic on the highway has to cross there. It is the duty of the traffic to look out for trains and to govern itself accordingly. With respect to live stock observed near the track, the rule is not the same. It is not prudent to assume that an animal will remain in a place of safety in the face of an approaching train; on the contrary, it is better to assume it will not do so, and be governed by this assumption.

In the present case the only testimony on the question of the efficacy of the headlight of the train within certain distances is given by the engineer. If this evidence is to be accepted, and there is no good reason why it should not be, it was impossible for him to have seen those cattle from the direct rays of his light within a distance in which the train could have been stopped; and they could not be seen, and were not seen, from the side flare of the light in time to have avoided the accident.

It is true the negro man, who was two hundred feet north of the crossing, testified he saw the cattle running towards the crossing when the train was a mile away. There is no other evidence in the record to substantiate this; and in the absence of corroboration on this point, we are disposed to believe this witness was in error, and to accept the engineer's evidence. We know, from observation, that it would require an unusually strong light to enable a person to discern an object as large as a cow one mile away.

We are reluctant to reverse the findings of the trial court on questions of fact, but when, after a studious consideration of the testimony, we feel certain that errors in this respect have been fallen into, we have to say so.

For the reasons herein assigned, the judgment of the lower court is annulled, avoided, and reversed; plaintiff's suit is dismissed, at his cost.